UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA DIVISION)

| | |
|---|---|
| FENTON COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> -against- <br><br> SOCIETY FOR HUMAN RESOURCE MANGEMENT, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

Plaintiff FENTON COMMUNICATIONS, INC. ("Plaintiff" or "Fenton"), by and through its attorneys, Zobrist Law Group and Davis+Gilbert LLP, for its Complaint against Defendant SOCIETY FOR HUMAN RESOURCE MANAGEMENT ("Defendant" or "SHRM") alleges as follows:

## NATURE OF THE ACTION

1. Fenton brings this action for damages arising from unpaid fees for services rendered and expenses incurred under an agreement between it and SHRM. As of the date of this pleading, SHRM owes an outstanding balance of $108,450.00 (the "Outstanding Balance"). Fenton commences this action to recover the Outstanding Balance, plus interest, fees, and costs of this suit.

## PARTIES AND VENUE

2. Fenton is a New York corporation with its principal place of business located at 244 Madison Avenue, Suite 307, New York, NY 10016.

3. Upon information and belief, SHRM is a Virginia nonstock corporation with offices located at 1800 Duke Street, Alexandria, VA 22314.

1

## JURISDICTION

4. Pursuant to 28 U.S.C. § 1332, this court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000 exclusive of interest and costs, and the dispute is between citizens of different states.

5. Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1) as to all Counts because SHRM is a resident within this judicial district. Venue is further proper in this District pursuant to the forum selection clause contained in the contract that forms the subject matter of this action, specifically, Section 15 of the Master Services Agreement, which provides in relevant part as follows:

> This Agreement shall be governed in all respects by the laws of the Commonwealth of Virginia without regard to conflicts of laws. Any disputes concerning the Agreement shall be subject to the exclusive jurisdiction of the federal and state courts in Virginia; and the parties hereby submit to the exclusive jurisdiction of the state and the federal courts in Virginia over any disputes concerning the Agreement and further agree that they are subject to jurisdiction in Virginia in any such dispute.

## FACTUAL ALLEGATIONS

**A.   The Agreement**

6. Beginning on or about September 1, 2024, the parties entered into a Master Services Agreement (the "MSA") and Statement of Work ("SOW") issued thereunder (collectively, the "Agreement"). A true and correct copy of the MSA and SOW are attached hereto as Exhibit A.

7. Pursuant to the Agreement, Fenton agreed to—and did—perform strategic counseling, research, reputation management, communications messaging and branding and coalition development services in connection with SHRM's assumption of leadership of the CEO Action for Inclusion & Diversity coalition (the "Coalition").

8. Pursuant to the SOW, SHRM agreed to pay Fenton a flat fee of $241,900, with 50% due upon signing the SOW and 50% due upon acceptance of the final deliverables. *See* SOW at Section III.

9. Pursuant to the MSA, SHRM agreed not to "unreasonably with[hold]" acceptance of Fenton's services. *See* MSA at ¶ 7.

10. The SOW further provides that "SHRM may terminate this SOW for any reason and at any time by providing thirty (30) days' written notice of termination" and that upon termination, "all work shall cease," *but only upon SHRM's* "payment [to Fenton] for work performed to the date of such termination." *See* SOW at Section II; MSA at ¶ 8.

11. The parties agreed that Fenton would perform services in three phases spanning the short period of September 1, 2024 through December 31, 2024, as detailed in the SOW. Phase I, from September 1 through September 30, consisted of planning and strategic counsel. Phase II, from October 1 through December 31, was for research and coalition development, and a third "discretionary" phase was for a Crisis War Room.

12. Pursuant to the Agreement, Fenton began performing the services contemplated therein. Throughout September, Fenton worked more than 200 hours and completed significant deliverables in the following categories: admin/project management, earned media, digital, thought leadership, research and coalition building, launch, and crisis communications planning.

13. On or about September 19, SHRM paid Fenton 50% of the flat fee, $120,950.

14. Shortly thereafter, SHRM hired Anuradha Hebbar to serve as SHRM's President of CEO Action for Inclusion & Diversity.

15. Fenton continued performing services through October. By the end of October, Fenton had performed 521.5 hours of work related to launch week, earned media, research and

coalition building, digital content and strategy, thought leadership, strategic counsel, and account management. In order to best support SHRM, Fenton even performed tasks above and beyond those listed in the SOW by engaging in proactive media efforts.

16. Fenton also shared with SHRM a project tracker which it updated regularly, and which detailed Fenton's ongoing work and completion of deliverables, including on the scoped CEO listening tour (the "Listening Tour").

17. Throughout this time, SHRM employees regularly praised Fenton's good work, both in writing and orally, including recognizing SHRM for a "quick win", its "quick work", and "awesome work."

18. Through late October 2024, the relationship between Fenton and SHRM continued progressing smoothly. SHRM did not indicate any discontent with Fenton's performance to this point.

19. On November 1, 2024, the parties held a messaging workshop in order for SHRM and Fenton to collaborate on messaging strategy. Ms. Hebbar was present at that meeting, during which Fenton emphasized that SHRM and Fenton would need to collaborate closely to clearly define the programmatic direction of the Coalition in order for Fenton to craft its communication strategy recommendations.

20. At this messaging workshop, Ms. Hebbar was unable to articulate a cohesive messaging strategy or direction to Fenton. This lack of direction from Ms. Hebbar was emblematic of her leadership and failure to properly manage her internal SHRM team.

21. Just days after this meeting, at Ms. Hebbar's request, Valarie De La Garza, Fenton's CEO, met with Ms. Hebbar. During that meeting, Ms. Hebbar blindsided Ms. De La Garza by making false accusations that Fenton failed to set up CEO interviews for the Listening Tour based

on its pre-existing relationships with Fortune 1000 CEOs and signatories. But this was never Fenton's obligation. While the Listening Tour was a scoped deliverable, the SOW deliverable only covered, in relevant part, "*recommendations* on targets", not guaranteed interviews.

22. Despite Ms. Hebbar creating needless friction between the parties with unfounded accusations, Fenton remained committed to performing under the Agreement and made numerous efforts to clarify the scoped deliverables regarding the Listening Tour.

23. In furtherance of these efforts, Fenton held multiple calls with SHRM, including with Ms. Hebbar and other team members, who reassured Fenton that: (1) SHRM and Fenton's expectations were aligned as to the Listening Tour specifically; and (2) Fenton was satisfying the scoped work. On this basis, Fenton continued to perform work on this deliverable, as mutually understood.

24. While the overwhelming majority of the SHRM team communicated that they were grateful for Fenton's partnership and support, Ms. Hebbar often admitted on these calls that she did not understand Fenton's capabilities and that she was frustrated with the terms of the SOW to which SHRM agreed.

25. Nevertheless, throughout November 2024, Fenton continued duly performing under the terms of the SOW in good faith, including thought leadership and media monitoring; keeping SHRM apprised on the status of the deliverables; delivering a high level communications plan to help SHRM internally align; following up on requests from Ms. Hebbar's team regarding numerous interview requests (in which Ms. Hebbar and her team were not responsive); completing an exhaustive audit of Coalition programs, tools and resources; and beginning an external landscape analysis. Fenton also sent SHRM action items for both parties in furtherance of the deliverables.

B.      **SHRM's Notice of Termination and Failure to Remit Payment in Breach of the MSA**

26.     On December 3, 2024, SHRM informed Fenton via teleconference that SHRM was terminating the Agreement due to Ms. Hebbar's view that SHRM no longer had a need for a broader external communications effort.

27.     That same day, by email and letter, SHRM purported to terminate the Agreement and directed Fenton immediately to cease work.  SHRM refused to remit further payment to Fenton, falsely claiming that "Fenton ha[d already] been compensated for work performed based on the engagement and deliverables provided to date" and therefore that "no further compensation [wa]s warranted under the [A]greement."

28.     Following SHRM's purported termination and pursuant to the Agreement, on December 3, 2024, Fenton sent SHRM a final invoice for $108,450, reflecting a prorated amount from the remaining half of the flat fee ($120,950).  A true and correct copy of the invoice dated December 3, 2024 (the "Invoice") is attached hereto as Exhibit B.

29.     Fenton gave a discount despite having completed all deliverables in Phase I and the discretionary phase, and all but two deliverables from Phase II, which were in progress at the time SHRM demanded Fenton cease work immediately.

30.     Despite Fenton's repeated attempts to recover the Outstanding Balance from SHRM, SHRM has objected to the invoice and refused to remit payment towards the Outstanding Balance.

31.     Pursuant to the MSA, SHRM's failure to pay renders its attempted termination invalid.  *See* MSA at ¶ 8.

32. As a result of SHRM's willful, unjustified refusal to pay, Fenton seeks to recover from SHRM the Outstanding Balance and Fenton's attorneys' fees and costs in pursuing the Outstanding Balance, as provided for in paragraph 23 of the MSA.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

33. Fenton repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

34. The Agreement is a binding and valid agreement between Fenton and SHRM.

35. Fenton duly performed all of its obligations pursuant to the Agreement.

36. SHRM breached its obligations under the Agreement by failing to pay Fenton the Outstanding Balance.

37. Fenton has made numerous attempts to collect the Outstanding Balance, but SHRM has failed and refused to make any additional payments.

38. SHRM's failure to pay the Outstanding Balance is a material breach of the Agreement.

39. As a direct and proximate result of SHRM's breach of contract, Fenton has incurred damages and costs in the amount of $108,450.00, exclusive of interest, fees, and costs.

40. Accordingly, Fenton is entitled to a judgment against SHRM in an amount to be determined at trial, but not less than $108,450.00.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

41. Fenton repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

42. The parties entered into the Agreement, whereby Fenton agreed to render services to SHRM, and SHRM agreed to pay for said services and expenses incurred by SHRM.

43. In every contract, there is an implied covenant of good faith and fair dealing imposed on each party.

44. Fenton performed all of its obligations in connection with the Agreement.

45. SHRM has failed to pay the Outstanding Balance incurred by Fenton in connection with services performed pursuant to the Agreement.

46. Fenton has made numerous attempts to collect the Outstanding Balance, but SHRM has failed and refused to make any additional payments.

47. In failing to pay the Outstanding Balance, SHRM has impeded Fenton's right to receive the "fruits" of the Agreement.

48. SHRM's conduct constitutes a breach of the implied covenant of good faith and fair dealing.

49. As a direct and proximate result of SHRM's breach, Fenton has incurred damages and costs in the amount of $108,450.00 and is entitled to full repayment thereof.

50. Accordingly, Fenton is entitled to a judgment against SHRM in an amount to be determined at trial, but not less than $108,450.00.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Quantum Meruit – Pled in the Alternative)

51. Fenton repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

52. Fenton agreed to render services to SHRM in exchange for payment.

53. Fenton performed services and incurred expenses in good faith for SHRM's benefit.

54. Under the circumstances, Fenton reasonably expected payment for said services performed and expenses incurred.

55. SHRM has failed to pay the Outstanding Balance owed in quantum meruit to Fenton.

56. Fenton is entitled to the Outstanding Balance, which reflects the fair value of the services it rendered to SHRM.

57. As a direct and proximate result of SHRM's conduct, Fenton has incurred damages and costs in the amount of $108,450.00 and is entitled to full repayment thereof.

58. Accordingly, Fenton is entitled to a judgment against SHRM in an amount to be determined at trial, but not less than $108,450.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unjust Enrichment – Pled in the Alternative)

59. Fenton repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

60. Fenton agreed to render services to SHRM in exchange for payment.

61. Fenton performed services and incurred expenses in good faith, thereby conferring a benefit on SHRM.

62. SHRM was aware that Fenton was performing these services and accepted Fenton's provision of services such that it should have reasonably expected to pay for these services.

63. SHRM has failed to pay the Outstanding Balance owed to Fenton, thereby enriching SHRM at Fenton's expense.

64. Under principles of equity and good conscience, SHRM should not be allowed to retain the Outstanding Balance, which reflects the fair value of Fenton's services.

65. Accordingly, Fenton is entitled to restitution of the sums that SHRM has failed to pay, in an amount to be proven at trial, but not less than $108,450.00.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Fenton respectfully requests that this Court enter judgment against SHRM as follows:

A. For judgment against SHRM on all Causes of Action in an amount to be determined at trial, but not less than $108,450.00;

B. For an award of costs and disbursements of this action, along with Fenton's reasonable attorneys' fees incurred in connection with this action; and

C. For such other and further relief as may be just and proper.

Dated: New York, New York
February 24, 2025

ZOBRIST LAW GROUP

By: */s/ Jonathan S. Jacobs*
Jonathan S. Jacobs
1455 Pennsylvania Ave., NW, Ste. 400
Washington, D.C. 20004
(202) 349-1452
jonathan@zoblaw.com

DAVIS+GILBERT LLP

By: */s/ Michael C. Lasky*
Michael C. Lasky (*pro hac vice* forthcoming)
Zachary Karram (*pro hac vice* forthcoming)
1675 Broadway
New York, New York 10019
(212) 468-4800
mlasky@dglaw.com
zkarram@dglaw.com

*Attorneys for Plaintiff*
*FENTON COMMUNICATIONS, INC.*